Argued and submitted October 9, 1998, reversed and remanded March 17, 1999

# SHANNON PLANTATIONS, INC.,
## an Oregon corporation,
### *Appellant,*

*v.*

## Michael BEROVIC,
### *Respondent.*

(9311-07614)

# SHANNON PLANTATIONS, INC.,
## an Oregon corporation,
### *Appellant,*

*v.*

## William C. MOAK,
### *Respondent.*

(9311-07625; CA A95473)

976 P2d 1149

Lisa E. Lear argued the cause for appellant. With her on the opening brief were R. Daniel Lindahl, Daniel F. McNeil and Bullivant, Houser, Bailey, Pendergrass & Hoffman.

Kim T. Buckley argued the cause for respondents. With him on the brief was Esler, Stephens & Buckley.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Warren, Senior Judge.

WARREN, S. J.

## WARREN, S. J.

In these consolidated cases, plaintiff seeks to recover amounts that defendants allegedly owe under Personal Liability Agreements that they executed as part of investing in two limited partnerships. The trial court granted summary judgment to defendants, and plaintiff appeals. We reverse.

We state the facts most favorably to plaintiff, the nonmoving party, drawing all inferences in its favor. *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1996); *Uihlein v. Albertson's, Inc.*, 282 Or 631, 634, 580 P2d 1014 (1978). In early 1983, Merle Rush decided to form a limited partnership to grow ornamental trees on land that he controlled in Linn County. Rush would be the general partner; investors would purchase limited partnership units, paying a relatively small portion of the nominal price in cash and executing recourse notes for the rest. Rush intended to target investors in the higher tax brackets, who, because of the recourse nature of the notes, would receive tax benefits considerably greater than their cash investments, at least until the actual harvest of the trees. In looking for someone to plant and manage the trees, Rush first got in touch with Sapp, a nearby tree grower. Sapp in turn got in touch with Aaron Shannon, the sole stockholder and chief executive officer of plaintiff, a corporation that at the time was successfully growing and marketing Christmas trees.

At Rush's direction, DuBoff, an attorney, prepared the necessary documents for the creation of Blaine Mountain Nursery, Ltd. (Blaine), the limited partnership. Included in the package were agreements between Blaine and plaintiff concerning the planting, maintenance, and harvesting and sale of the trees, along with Personal Liability Agreements that required the limited partners to pay Blaine's obligations to plaintiff if Blaine failed to do so. A jury could find that the amounts that Blaine was nominally to pay plaintiff for its services were far greater than was reasonable for that work. It could also find that the agreements between Blaine and plaintiff required plaintiff to plant many more trees on the land than was optimal, with the result that the projected period between planting and harvest, and the projected value

of the harvested trees, was unrealistic. A jury could find that the decisions concerning both pricing and the number of trees were driven by the immediate tax benefits that they would produce for the limited partners rather than by the needs of the partnership's intended business.[1]

Among the package of materials that Shannon signed was an agreement by which Rush, Sapp (who functioned as a subcontractor under plaintiff), and plaintiff agreed to share their profits from the undertaking. Each would receive various payments from the partnership, would deduct the actual costs of performing the required services, and would give the excess to Rush, who would hold it in a trust account. The money from the trust account would be used for marketing expenses and, when the project was complete, the three parties would split what remained. Rush, Sapp, and plaintiff also agreed that the deferred sums to which they were entitled under their agreements with the partnership would be payable only after the limited partners received a return of all of the funds that they actually invested, plus 14 percent interest.[2] Although these apparently were separate agreements, they were clearly related, with the 14 percent agreement functioning as a limitation on the profit sharing agreements. After the Blaine partnership closed, plaintiff and Sapp planted the required trees, for which plaintiff received $2.04 per tree. Plaintiff deducted the actual planting cost of 62 cents per tree and gave Rush the remaining $1.42 per tree.

In 1984 Rush formed a second partnership, Timberlinn Nursery, Ltd. (Timberlinn), which was a duplicate of Blaine, except that Sapp did not participate.[3] Although Shannon wanted to have the same deal in Timberlinn as in Blaine,

---

[1] Shannon had told Rush that the number of trees proposed was far greater than was optimal. He was not personally familiar with most of the other aspects of the limited partnership offering.

[2] Defendants placed parts or all of many of the documents related to the partnership into the record. However, the agreements between Rush, Sapp, and plaintiff are not in the record, even though defendants quote portions in their brief. We consider only the evidence concerning those agreements that does appear in the record, which is primarily found in Shannon's deposition, and give no consideration to the excerpts that defendants include in their brief.

[3] Among other things, the land involved in Timberlinn was closer to plaintiff's location and further from Sapp's than was the land in Blaine.

he and Rush never agreed on a profit-sharing agreement for Timberlinn similar to that with Blaine, nor did they agree not to take the deferred payments until the limited partners received their money back together with 14 percent interest.[4] As with Blaine, the limited partners signed Personal Liability Agreements in which they promised to pay Timberlinn's liabilities to plaintiff if Timberlinn did not do so. Each defendant invested in both Blaine and Timberlinn.

In early 1985, Sapp became concerned that Rush might have misappropriated the money in the trust account.[5] He told Shannon of his concerns, and Shannon set up a meeting with Rush to discuss the issue. He also hoped at that meeting to agree on a profit-sharing arrangement for Timberlinn. The morning of the meeting, Rush died from a self-inflicted gunshot wound. Thereafter, Shannon determined that Rush had embezzled the money in the trust account.

After discovering the embezzlement, plaintiff sued the Rush estate to recover at least the excess planting fees that it had given Rush. Blaine and Timberlinn also sued the estate. During the course of that litigation, the limited partners for the first time learned of the profit-sharing and 14 percent agreements. They became concerned that those agreements might affect the tax deductibility of their investments. In July 1986, after considerable negotiations, all parties, including the limited partners, entered into a settlement of those disputes. One purpose of the settlement was to adjust for whatever result a tax audit might produce. All parties executed two settlement agreements, one for each partnership, that were identical except for the names.

The crucial paragraph of the Blaine agreement, which is essentially identical to the Timberlinn agreement, provides:

---

[4] Defendants argue that, although there was no written profit-sharing agreement, there was an oral agreement. The most that a jury could conclude from the deposition testimony on which defendants rely is that Shannon expected that there eventually would be an agreement but that he and Rush never actually reached one.

[5] Although there was no profit sharing agreement for Timberlinn, plaintiff gave Rush the money that it received that exceeded the costs of planting the trees for Rush to hold for future marketing expenses.

"1. The notes executed by the limited partners of Blaine Mountain Nursery, Ltd. (hereafter 'limited partners') shall retain their recourse character except as hereafter provided. If deductions reported by the Partnership or the limited partners are disallowed by the Internal Revenue Service, or by any court (including U.S. Tax Court) to which any appeal may be taken, and if the contractual arrangements between Merle A. Rush, Aaron Shannon, Shannon Plantations, Inc., and others affected allowance of such deductions, then, at the election of the limited partners, their respective obligations under their promissory notes to the Partnership and under their respective Personal Liability Agreements will become nonrecourse, i.e., payable only out of, and to the extent of, amounts otherwise payable to each limited partner from Partnership distributions of net cash proceeds of sale(s) of trees owned and harvested by, or on behalf of, the Partnership and subordinated as more fully described in paragraph 3 below."

Paragraph (2) of the agreement provided that Blaine's obligations to plaintiff would become nonrecourse under the same conditions. Paragraph (3) established two different sets of priorities for distribution of the proceeds of harvesting the trees, depending on whether or not the limited partners were ultimately able to take tax deductions as originally contemplated. The agreement also provided for the continuing maintenance and ultimate sale of the growing trees, including recognizing that the trees might not be saleable within the originally contemplated periods. Finally, the limited partners released plaintiff and Shannon from claims arising from the loss of tax deductions.

When it reviewed the partnership tax returns, the IRS questioned the tax losses that the partnerships passed through to the limited partners. It then audited the partnerships' tax returns to determine the validity of those losses.[6] In his reports, issued in 1987, the tax examiner concluded that the amounts provided in the offering memorandum for tree planting, maintenance, and similar expenses, which were the

---

[6] To the extent that the IRS denied the claimed partnership losses, of course, the limited partners would lose the right to claim the passed-through losses on their individual returns.

basis for the partnerships' deductions,[7] were grossly overstated. In reaching that conclusion, he relied in part on an independent appraisal of the costs of planting and maintaining the trees and in part on information from Portland nurseries concerning the probable sale prices of the trees when grown.

Based on the examiner's report, the IRS proposed to disallow the partnerships' deductions and to charge them additional interest and penalties. The IRS asserted four legal positions for reaching that result:[8] (1) The partnerships were structured primarily, if not exclusively, for the "purpose of generating tax losses for the investors by inflating the value of all the contracts to the point were [sic] the partnership[s] will be expect to just break even, or loose [sic] money." (2) The sole purpose of the inflated values for planting and maintaining the trees and for leasing the land was to give the investors deductions of three times their cash investment in the first five years of the partnership. Those expenses were neither ordinary nor necessary, and the amounts claimed were not deductible. (3) Plaintiff's relationship to the enterprise was such that the amounts for which the investors were at risk to plaintiff were not owed to a person whose interest in the activity was solely that of a creditor within the meaning of the applicable Internal Revenue Code section. The same was true as to Rush. Thus, only the amounts that the investors actually paid would be deductible. (4) Under the tax rules related to farmers and nurseries, the cost of unharvested crops would be deductible in the year paid, not the year in which the cost was accrued.

None of the positions on which the tax examiner relied to support the proposed disallowance of all or part of the deductions related to the profit sharing and 14 percent agreements between Rush, Sapp, and plaintiff. It appears

---

[7] For each partnership, the amounts claimed as losses were approximately $1.1 million, while the limited partners' actual cash contributions were around $350,000.

[8] The IRS did not assert the fourth position as to Blaine. If accepted, the first position would lead to disallowance of the deductions in their entirety, while the second, third, and fourth positions would lead to disallowance of a portion of the deductions.

that the IRS was not aware of either agreement at the time of the audits.

Blaine and Timberlinn appealed the proposed actions through the appropriate IRS process. In June 1990 the IRS appeals officer offered to compromise the dispute by disallowing exactly half of the deductions and dropping the claims for penalties and extraordinary interest. He described the facts on which he relied in making that offer as: (1) the independent appraisal supported a contract value that was approximately equal to the cash investment; (2) the existence of the 14 percent agreement suggested that the notes concerning the deferred payments were actually nonrecourse; and (3) the IRS never received written notice of the appointment of Rush's successor as tax matters partner, raising a question of whether the agreements that that partner signed to extend the statute of limitations were valid. The first two factors supported the IRS' position that the contracts were overvalued and that the notes for deferred payments were nonrecourse; the third factor constituted a risk of litigation if the IRS were to pursue the matter.

Rather than accept the proposed settlement, Blaine and Timberlinn appealed to the United States Tax Court. Before that court issued a decision, the IRS and the partnerships agreed to settle the case. The Tax Court issued a decision in 1992 that implemented the settlement and is the only significant evidence in the record concerning it. Under that decision, the deductions for planting fees were cut in half, while those for nursery rent for both partnerships and interest for Blaine in 1984 were also reduced. The planting fees were the only reduced deductions that involved Shannon; the nursery rent involved Rush. The settlement allowed the remaining deductions, including maintenance fees that involved payments to Shannon, at the full amounts claimed in the partnerships' original filings. Overall, the two partnerships received deductions that totaled about $220,000 more than the earlier IRS offer.

After the conclusion of the tax proceedings, plaintiff filed this action to recover on the Personal Liability Agreements. In their Answers to plaintiff's complaints, defendants raised the affirmative defense of settlement; as part of that

defense they purported to convert the agreements to nonrecourse liability in accordance with the settlement agreements. The primary issue on appeal is whether defendants had the authority under the settlement agreements to take that action and, if they did, whether they acted properly in doing so. The resolution of that issue begins with the terms of the settlement agreements.

■      Under the settlement agreements, in order for defendants to be able to declare the notes nonrecourse the IRS, or any court to which an appeal is taken, must have disallowed "deductions reported by the Partnership[s] or the limited partners" and "the contractual arrangements between Merle A. Rush, Aaron Shannon, Shannon Plantations, Inc., and others" must have "affected allowance of such deductions[.]" There is no dispute that the Tax Court disallowed deductions that the partnerships took. The question is whether contractual arrangements that the settlement agreements describe affected that action. Defendants argue that the contractual arrangements that the settlement agreements contemplate include *both* the profit-sharing arrangement between Rush, Shannon, plaintiff and Sapp about which the limited partners knew nothing when they decided to invest *and also* the planting agreements between the partnerships and plaintiff that were part of the original offering memorandum and of which the limited partners were aware.

It is clear that the planting agreements affected the deductions; they were at the heart of the IRS position that the partnerships' expenses were grossly overstated. The trial court apparently relied on the planting agreements in determining that defendants had the right to declare the notes nonrecourse. Thus, if defendants and the trial court are correct, and if plaintiffs' remaining arguments fail,[9] defendants had the right to declare the notes nonrecourse. The problem is that the settlement agreements do not necessarily refer to the planting agreements and are ambiguous on that question.

---

[9] Plaintiffs also argue that defendants waited too long to declare the notes nonrecourse and that they were entitled to do so only to the extent that the deductions were disallowed, not to the full extent of the Personal Liability Agreements. Because of the view that we take of the other issues, we do not need to decide these questions.

The settlement agreements refer to arrangements between Rush, Shannon, plaintiff, and others, with no express mention of the partnerships. It is possible that the "others" may include the partnerships; it is also possible that they may be limited to Sapp and other individuals outside of the partnerships who participated in side deals, such as the profit-sharing agreement. The surrounding circumstances may suggest that the planting agreements were not one of the arrangements to which the settlement referred. The partnership offering memoranda relied on them as an important basis for the deductions that the partnership would provide, so the limited partners knew about them from the beginning. The complaints that the partnerships filed against the Rush estate, which were part of the immediate context for the settlement, treat the planting agreements as valid and assert that the separate agreements between Rush and the others threatened the deductibility of payments that the partnership made under the planting agreements. These considerations are not conclusive, however; we cannot, on this record, resolve the ambiguity as a matter of law. Because of the ambiguity, the trial court erred in relying on the planting agreements in granting summary judgment to defendant.

■■ The profit sharing and 14 percent agreements are unquestionably among the agreements to which the settlements refer. If we can say, as a matter of law, that either one affected the deductibility of the partnership losses, and if plaintiff's other arguments fail, we must affirm the grant of summary judgment. For Timberlinn the answer for these agreements is clear: as we previously stated, at the very least a jury could find that there were no such agreements for Timberlinn. Nonexistent agreements could not have affected the deductibility of Timberlinn's expenses. As to Blaine, the exact relationship between the profit sharing and 14 percent agreements is unclear on this record, but it is certain that there is a relationship. We will, therefore, consider whether the record conclusively establishes that either or both affected the ultimate agreement with the IRS that resulted in a partial denial of the claimed deductions.

The IRS noted that plaintiff had to turn over the excess planting fees to a corporation that Rush controlled, to be used for any required replanting and future maintenance.

It also noted that Shannon believed that plaintiff was entitled to the full amounts specified in the contract and that he thought that he had received a "sweet deal." Those statements relate primarily to whether the amounts that Blaine agreed to pay plaintiff were excessive for the work performed. They suggest that the IRS believed that plaintiff gave Rush the excess money because it had not earned it, but they do not clearly reflect that the IRS believed that there was an agreement that plaintiff would share the excess money and other profits with Rush and Sapp.

The IRS did refer at one point to the 14 percent agreement. The examiner did not mention it in his original report; so far as the record shows, he was not aware of it. Instead, he relied on the planting agreements and the overall excessiveness of the planting and maintenance costs, combined with the significant overestimate in the offering memorandum of the price of the trees at harvest, in proposing to deny all of the deductions. However, the IRS appeals officer referred to the 14 percent agreement to support the IRS position when he offered to settle the dispute with the partnerships. In that offer, the appeals officer relied both on an independent appraisal that suggested that the contract value was approximately equal to the cash investment and on the 14 percent agreement to support the position that the investors' notes were in fact nonrecourse. He then proposed a settlement by which Blaine would give up half of the claimed deductions.

Blaine did not accept that settlement offer. The only significant information in the record concerning the settlement that it did eventually reach is the tax court decision that implemented it. The decision simply states the amounts that Blaine was allowed to deduct for the tax years 1983-85, without describing any reasons for the decision. Those amounts included all of the originally claimed deductions, except that the planting fee for 1983 and nursery rent for 1984 were reduced by one-half and interest for 1984 was reduced by about 53 percent. At least in the absence of any evidence concerning the negotiations that led to the settlement, it is possible to interpret those reductions as relating solely to the excessive fees for planting and rent.

The dictionary definitions of "affect" include "to act upon," "to produce a material influence upon or alteration in," "to have a detrimental influence on," and "to make an impression." *Webster's Third New International Dictionary*, 35 (unabridged ed 1993.) Common to all of those definitions is that the thing affecting actually make a difference to the thing affected. We cannot say on this record that one reference to the 14 percent agreement in a rejected settlement offer conclusively shows that the ultimate settlement, which was more favorable to Blaine than the original offer, was affected by the profit sharing and 14 percent agreements. The trial court, thus, erred in granting summary judgment as to Blaine.

After its ruling on defendants' motion, the trial court concluded that plaintiff's motions for summary judgment on two of defendants' affirmative defenses were moot and, therefore, did not rule on them. Plaintiff assigns error to that decision and argues that we should rule in its favor on the motions. We decline to do so, because the proceedings on remand might be adversely affected if we were to decide these motions before the trial court has ruled on the merits. The issues involved in the motions are heavily factual and are related to many of the other factual issues in the case. So long as the trial court retains jurisdiction over the case, it can change or modify its ruling on a motion for summary judgment, in the same way that it has the authority to modify, amend, set aside, or vacate any other order that it makes. *See State ex rel SOSCF v. Fuller*, 156 Or App 128, 134, 964 P2d 1140, *rev den* 328 Or 115 (1998). Thus, if the trial court on remand were either to grant or to deny the motions, it would remain free to change that decision if subsequent developments in the case convinced the court that it was appropriate to do so. If, however, we were to hold at this time that the court should either grant or deny the motions, we would limit the trial court's action in ways that might affect its ability to respond to future developments in the case. It would not further the efficient processing of the case as a whole for us to decide these issues at this time.

Plaintiff finally assigns error to the grant of attorney fees to defendants. We have reversed the judgment on the

merits, and the judgment for attorney fees necessarily falls with it.

Reversed and remanded.